The case is number 18, 1877, Westrock Virginia Corporation against the United States. Mr. Stoke. Thank you, Your Honor. Good morning, and may it please the Court. I want to focus on just a few key points. Statutory constructions. Do you dispute any of the facts recited in the Court of Federal Claims? Can you be more specific about which facts? I mean, facts... No, I'm asking if you dispute... I'm looking for... I have a draft. I always have a draft, and I want to know if I can rely on those facts, statements of facts. I don't... I can't think of a fact in the Court of Federal Claims decision that we dispute, but... If there's a point along a scale of one to a hundred of producing steam as opposed to electricity, is there any point at which you'd concede that the purpose of the statute is not satisfying? Say you're producing 99% steam and 1% electricity. The statute does not allow for allocation of basis. The statutory text is clear. Quote, 30% of quote, basis of quote, specified energy property. Okay? And for purposes of the cross motions, there's no dispute about the basis. The government has conceded in a sworn, you know, in their interrogatory response that we cite, it's in Appendix 156. We discussed it in our brief 10 to 11. The cost basis of the qualified property is $280 million. Application of the statute is straightforward arithmetic. 30% of that. Sorry? Those are facts. Those are facts that are undisputed. Right. My understanding is all the facts are undisputed. The material facts are undisputed. Yes. The material facts are undisputed. So, so your beef is IRC 45. No, Your Honor. Our beef is that there is no basis in Section 1606, 1603, excuse me, there's no basis in the statute to limit basis, to condition basis on anything, to allocate basis. Okay. In order to... Doesn't 1603 use the definitions of qualified property from 45 and 48? Yes, it does. And the government agrees that qualified property here has a cost of $280 million. Okay? Was the qualified property, according to 43, is a facility using open-loop biomass to produce electricity? A facility... That's the definition of qualified facility. That's the definition of a qualified facility. The government states over and over that there's a definition of open-loop biomass facility that conditions the grant on the production of electricity. There is no definition of open-loop biomass in the statute. The definition is of qualified, a qualified facility. But this facility only produces electricity in part. That is absolutely wrong, Your Honor. This, every, every, all of the steam that's produced here is used to generate electricity. All of the steam is used to produce electricity. Is no steam diverted for other purposes? After it goes through the generating turbine. I mean, any generation facility that uses steam, nuclear, oil, coal, biomass, there's going to be... This is a factual question. It's not relevant or material, Your Honor. We're focused on the legal issue. In order to affirm, in order to find that this statute allows an allocation of basis, the court would have to treat the guidance as law. It would have to treat the guidance as law. That's the only place allocation is mentioned. That's the only place qualifying activity or non-qualifying activity is mentioned. Those terms are not in the statute. Those terms have no relationship to anything in the statute. And it's, you know, the guidance is not law. That's not how administrative law works. You can't have an agency that comes out with an informal guidance, no tether to the statute, and say that this is going to affect $40 million worth of a statutory grant where the statutory terms are clear. 30% of basis in specified energy property. Okay, you know, let me just take a step back. The big picture here is this. Westrock did exactly what Congress wanted it to do after the recession. Westrock invested almost $300 million in a renewable energy facility in reliance on a statute that's clear, that says they're going to get 30% of their basis in specified energy property. That was $85 million approximately. Don't talk. Yes, sir. My understanding of the record may be wrong. I understood that a percentage of the steam was used to generate electricity and a percentage went to the paper mill. You're saying that 100% of the steam was used to generate electricity. It goes through the turbine generator. I don't think that's disputed. I also don't think it's relevant. All of this... Listen, I don't care whether you think it's relevant. I want you to answer my question. All of the steam goes through the electricity generating turbine is my understanding. It's in the record. Because that's my question. Whether you think it's relevant or not. This is the, I believe, the, um, you'll see, uh, let's see, it says, um, at the bottom in paragraph five, the Mitsubishi steam turbine, which is the generating turbine received superheated steam from two boilers at high pressure. Um, and in paragraph three, the Covington facility uses two boilers to provide the steam. And so, you know, I would also say that the purpose here, as I was starting to say, Congress's purpose was to incentivize renewable energy projects. The steam, let's say, let's say there's no difference in our view of this between the steam and the energy. There's no proper basis to allocate them. But even if there were, the steam itself is generated by renewable energy. It's part of the statutory purpose. Previously, uh, Westrock used coal and oil to create steam for this facility. That's, uh, in the Court of Federal Claims opinion, citing the record, I believe at, um, at 10. And so the entire facility is a renewable energy facility. And Westrock did exactly what Congress wanted. It invested $300 million in a renewable energy facility. And it did so in reliance on this statute, in reliance on an $85 million grant. The government says, well, we'll tell you after five years of litigation how much your grant is. The government admits expressly, they say, they say allocation is required, but they say in their brief that there's no particular allocation method. In W.E. Partners, there was one allocation method. In G.U.S.C., there was one allocation method. This is in the government's brief at, I believe, 45, um, 43. So the government's position is, we'll tell you after five years of litigation how much your grant is. And by the way, it's $39 million, not the $85 million that you counted on when you made this investment in reliance on the statutory terms 30% of basis. That's just not how tax incentives work. Investors are entitled to certainty. They're entitled to know what the tax, you know, this is not strictly tax, but they're entitled to know what the financial consequences of their $300 million investment are at the outset. And the statute says 30% of basis, and that's what they're entitled to. The arguments that the government makes and that the Court of Federal Claims accepted for limiting basis, allocating basis, are not in the statute. Okay? There's nothing about limitation, there's nothing about conditioning, there's nothing about qualifying activity, or even what a qualifying activity is. That's all argument by the government here in their briefs. Okay? And again, as I said, that is not how administrative law works. If the court enforces the guidance, the treasury guidance as law, as if it went through notice and comment rulemaking, it just is going to invite mischief in a whole range of cases where agencies issue informal declarations all the time. It's not law. It's not in the statute. It's not a construction of any term in the statute. What was the basis in the record for the determination that, based on information provided by Westrock, the NREL estimated that approximately 49.1% of the energy in the steam produced is used for the production of electricity? Yes, Your Honor, that's a reference. That's in Appendix 16. Excuse me? That's in Appendix 16. Yes, I believe that's a reference to the treasury award letter, which is in the appendix at 453. And what I'm saying is that allocation has no basis in the statute. There's no basis in fact. Pardon me? That's what I'm looking for. I don't believe it has a basis in fact either. All of the steam runs through this facility. What's the basis for that conclusion, that 49 point whatever percent? It's not stated in the treasury's award letter. So what the letter says is, let me read from it. This is Appendix 4. Did you contest that as a fact matter? We did contest that as a fact matter. On what basis? On the basis that all of the steam runs through the turbine. Remember I started this questioning by asking you about contesting? Yes, Your Honor. Let me try to further answer your question. All of the steam runs through the turbine. Any facility that generates electricity using steam is going to have steam coming out the other side. There's a question about what to do with it. It has to condense so that it can go back into the front of the turbine. You can condense it by putting in a big condenser and allowing the remaining energy in the steam to be wasted. Or you can run it back through the facility and use it for other purposes to condense the steam. That's what happened here. But to say that there's electricity plus steam is double counting because the steam has already been counted when it goes through the turbine. I don't know how else to say it other than the other point that I've been making here, which is that even the steam itself is renewable energy. It's made from renewable energy. Previously, Covington, and this is in the Court of Federal Claims opinion, and this is in the record, used oil and gas to create steam to run this facility. Now they're using biomass. That's what Congress wanted. Congress wanted investment. It wanted jobs after 2008. It wanted renewable energy facilities. That's what it got, $300 million, $286 million of a renewable energy facility. The electricity is made from renewable energy. The steam is made from renewable energy. And Westrock invested that money in reliance on the terms of the statute, which are not ambiguous, 30% of basis in specified energy property. There's some little amount that isn't made from renewable energy. Isn't that correct? Start-up. It's a little bit of fossil fuel that's used to start up the turbines. It's my non-technical opinion. There was something called – Black liquor. Black liquor. You know, this was also a very minor thing disputed below. We say that is biomass, and I can give you a cite for that when I come back for my remaining time. Okay. Now let's hear from the government. Mr. Weiner. Good morning, and may it please the court. Andy Weiner for the United States. If I can, I'd like to just start with the factual point on page 11 that I believe the court was asking about before. The second full paragraph on appendix page 11 is the court's opinion, and it says, The commingle steam then passes through a steam turbine generator. Westrock extracts a portion of the steam from the steam turbine generator prior to exhaustion and diverts the steam to the paper mill to be used in its industrial process. And the cite that the court uses is Stockwell Declarations, paragraph 3 and 5. In addition, the government's expert report on pages 897 to 899 goes into some detail as to what extraction occurs, how much energy is diverted from the turbine to the paper mill and does not pass all the way through the electricity turbine generator. It enters but does not exit because it is diverted at three stages in the course of the turbine. You're saying that none of that in any way contributes thereafter to the production of electricity. Is that what you're telling us? Correct. Then it is seen to be used in the industrial process. Now, that's a factual question. That's why I started out asking that question to your opposing counsel. But it's not disputed, I think. It doesn't seem to be. This doesn't seem to be disputed. Correct. That's the government's position, that first of all, not disputed. Your opposing counsel keeps telling me it's irrelevant. But it seems to me that his argument is, oh no, we're using the steam to 100% of its kinetic capacity in order to generate electricity. And then there's trickle-off, which you would have either sent to a condenser or we happen to take it and use it. But that doesn't square with what the findings are. Correct. Yes, and that's something that we addressed in the end of our brief. And the question then that I also want to address, it was something of a factual related question that this court asked in opening argument, was how did Treasury make the allocation? And that allocation is made on – there's something called a checklist, an application checklist. Doesn't the National Energy Lab go in and audit this stuff? Yes, so what happens is when an application comes in, then it goes to NREL, which is a scientific laboratory body that reviews the substance of the application. And in this case, the application claimed that 100% of the energy produced was used to generate electricity. It was not true. But NREL did its investigation, and based on the schematics of how the facility was set up, it determined that – I want to make sure I get the percentages right – that 0.22% of the energy was generated by fossil fuel, based on startup and flame stabilization. And then another 49.1% of the energy – I'm sorry, 51.2% was used – was diverted to the paper mill, and only 48.8% was actually dedicated to the production of electricity. But the issue is the cost basis of the facility, which I assume the argument is that that would be the same whether or not there was some diversion to the paper mill or some other non-electricity-generating use. I understand, Your Honor. And so to bring that back to the statute, the statute says, look, we're going to give you a payment in lieu of a production or an investment tax credit based on placing in service a facility that does two things. Plain as day in the statute under 45.23. The facility must use open-loop biomass to produce electricity to the extent that it does something else. If it uses fossil fuel, it's not eligible for the payment. If it doesn't produce electricity, it is also not eligible for the payment. And so when you have a facility that is producing kinetic energy, that is producing steam that both powers a generator to produce electricity and does something else, you have to allocate. Now, you have to allocate under Section 48, and you have to allocate under 1603. Now, the statute, in government's view, is plain. First of all, you have the plain language of the statute. And then you have the fact that you're supposed to construe credits narrowly, and so, therefore, if you're doing something that's not the activity as required by the statute, then that is not a creditable, then you do not get credit for that. In addition to that, as I said, Section 45 only gives you a credit if you produce electricity. So if you don't produce any electricity, then you don't get any credit whatsoever. Under 48, 48 says, look, because at the same time that Congress created the stimulus package, Congress allowed taxpayers to claim the basis, their investment in a 45 facility as an investment credit under 48. And when it did, by doing that, however, there are certain rules that the Treasury regulations under 48 require you to allocate when there is an activity that doesn't meet with the terms of the statute. The regulations address solar facilities, because solar facilities have been in 48 for decades. This is relatively new. There's no specific regulation that speaks to open-loop biomass facilities, because that is a recent addition to 48 in 2008. But the same principle applies. It says, look, if you're doing something that is both within the confines of what Congress deems credible and outside of what Congress deems credible, then you have to allocate as between those two activities. Mr. Weiner, you referred to page 11 in the appendix. Yes. You read the sentence, Westrock extracts a portion of the steam from the steam turbine generator prior to exhaustion and diverts the steam to the paper mill to be used in its industrial process. That cites the Stockwell Declaration, paragraphs 3 and 5. Look in the appendix 379, 378 is 379. That's the Stockwell Declaration. Yes. And on 379 at the top of the page,  and a portion of the steam is extracted to power the biomass facility itself only after the steam's pressure. This is, I think, the important sentence. Only after the steam's pressure and temperature is reduced even further is a portion of the even less efficient steam extracted and sent by an outgoing pipe to the adjacent paper mill. So it sounds to me that what he is saying is entirely consistent with what your adversary just argued, that the steam that goes to the paper mill is steam that comes out of the turbine at some point, so that all of the steam is powering the turbine. Well, Your Honor, we're not disputing that all the steam enters the turbine, and then there are, I believe, three extraction points. Well, if all the steam enters the turbine and the turbine is generating electricity, then isn't the entire facility there to generate electricity? No. And the diverted steam is simply steam that would otherwise be wasted. No, Your Honor, but that part we respectfully disagree with. All right, tell me why. Tell us the facts on this. So the turbine generator is not a single point in time. There is a path by which the steam travels all the way through, and by virtue of extracting— I don't mean to interrupt, but I'm going to interrupt. Is there any steam that is produced that is not first fed to the generator? No. My understanding is no. It all enters the generator, and it is— So all of the steam is helping to motivate the turbine, which is a source of generating electricity, right? Correct, but the energy that is in that steam is not used to its full capacity to generate electricity. Is that a deliberate choice, or is that just a matter of inefficiency? Oh, no, that is a deliberate choice because it is extracted at three different points. The steam is high-pressure, medium-pressure, and low-pressure. At all points, the steam is still usable to generate electricity, and it is extracted, and it is diverted to the paper mill for an industrial purpose, which is a noncreditable activity. Where is that in the record? I mean, what we see is citations to Stockwell, I think his name is. What tells us those numbers? I would think that an audit would do that. Well, a portion of the steam— Well, first of all, it says a portion of the steam is extracted to the power biomass facility itself. So that is the high-pressure steam that is diverted back into the boiler. And then at a lower point, this is the middle and the low-pressure, it is then extracted. It still is very useful for the generation of electricity, but it is extracted and sent to the paper mill. So you're saying that these extractions are part of the design. It's all part and parcel of what was intended. Yes. And that, therefore, there is legitimacy in saying that 51%, or whatever the percentage is used for electricity, and the other 49% was designed to produce a different result. Correct. But again, where is all of this in the record? So can I direct you to the government's expert report? Where? 896 to 899. Good. So the figure that you see there is very similar to the one that we included in our brief, which is also in the government's expert's opening report. But what it expresses to you over the course of four pages, and then if you look at the last page, which I think to be as efficient as possible in explaining this, if you look at table number four, there is steam extracted at various points. And the extraction initially does not cost, does not have a great effect on the amount of electricity that is produced.  You see that there is a pretty significant delta. There is 8.4 versus 15.2 megawatts if the steam had passed all the way through. So by extracting steam at stage three, you're basically eliminating the energy that's in that steam. You're taking seven megawatts off the table. You're choosing to produce less electricity. Correct. And then in stage four, you have a really significant delta as between those two numbers. You have 28 megawatts of electricity that is not being generated by virtue of the extraction of the steam. And so Stockwell, I believe his declaration, sets forth that the steam is extracted, and this gives you exactly what the effect of that is. And that is the design of the facility. And that's your argument then is that that ties back into section 45 D3 because the facility is designed so that only portion of it produces electricity. Right. 1603 was a stimulus program that was created because nobody wanted credits in 2008 because credits are only useful if you have income that generates income tax. If everybody's got losses, credits are not useful. They just carry forward. And so what did Congress do? It said, look, instead of credits, we'll give you cash. Everybody loves cash. And so that will create an incentive when credits aren't creating an incentive to invest in these renewable resources. Now, what Congress wasn't doing, though, wasn't creating a new incentive. It was creating a different form by which it had already incentivized through credits. And so, therefore, instead of getting a production credit under 45, which is how much electricity you produced, or instead of getting an investment credit under 48, which would require an allocation between electricity production and non-electricity production because it, too, borrowed the definition under 45. It's saying, look, we'll give you a payment from the Treasury, but that is designed to be in lieu of. It's not a new subsidy. And so what's really going on here is they're trying to say, look, all we've got to produce is produce like one watt of electricity or maybe even no watts of electricity. They say the operation of the facility has no bearing on the 1603 payment. And so, therefore, you could build the thing and then let it sit idle and presumably, under their theory, you'd be entitled to the credit. And that's an absurd result. That is incorrect. That is contrary to what Congress is intending to do, which was to incentivize the construction of a facility that uses open-loop RMS to produce electricity, unless there are any other questions the government has. Any more questions? Ms. Quarterford. Any more questions? Thank you, Mr. Whiting. Thank you. Mr. Strunk, you have your opinion. Yes, thank you, Your Honors. First of all, the effect of the extraction on the production of electricity was hotly disputed below. Our expert evidence was that if the steam was not extracted at all, there'd be only 4% more electricity. There were no findings that were ever made on that by the lower court. What the lower court did was it affirmed the allocation in the Treasury Award Letter, the 48.2%, I believe it is, and 52.2%. It knocked down our 30% of basis grant by 52.2% for reasons not explained by the Court of Federal Claims. That's what happens. So the grant of summary judgment to the government was improper, even if allocation is proper, because there was no finding that the allocation that led to the award that Treasury made was supported by it. There's just nothing in the lower court decision about that. But I want to go back to... But did you challenge that as a fact finding? Yes, we did. Of course we did. Yes, there was expert testimony going. The expert report that my friend just quoted from, as I said, was disputed by our expert in terms of what the effect of the extraction of steam was. But Judge Wallach, on your question, I hope we've cleared it up, that the steam goes into the generator, but I'm standing by our position here that it's not relevant to the statutory text. My friend said a couple of times when he was up here that if the facility produces electricity... You can go down that road, but your problem is we apparently think it is. It's a qualified facility if it produces electricity. This facility produces electricity. There is nothing in any statutory text about conditioning, limiting, allocating, qualifying activities, non-qualifying activities. There is nothing in any statutory text about conditioning, allocating, or limiting. Or running it, so you could just leave it... No, we have to produce electricity, which it does. 74 megawatts of electricity. This is the ninth largest biomass electricity generating facility in the country. 74 megawatts is a lot of megawatts. A two-unit nuclear power plant is 1,200 megawatts, so 74 megawatts is a lot of megawatts. This is an electricity generating facility. It's a qualified facility. The government doesn't dispute that. The basis of the qualified property is $280 million. The government acknowledges that. We're entitled to 30% of the basis. But it's also a steam generating facility. The steam is used to generate electricity. It's also used for other purposes. Yes, it is. In the pulp mill. Yes, it is, Your Honor. Yes, it is. Doesn't that count? It doesn't count under the statute. Part of it is for producing electricity, part of it is not. We'll pay you the 30% of the basis for the part that produces electricity. Where does it say that? It doesn't say that in the statute. And I, you know, it doesn't say that in the statute. It defines qualified facility as a facility using open-loop biomass to produce electricity. That's what this does. There's another subsection that says a facility using solar to produce electricity is a qualified facility. There's another subsection that's in our reply brief that says a facility using hydroelectric power to produce electricity is a qualified facility. Congress wanted to incentivize renewable energy. What they really wanted to incentivize was investment after the recession. $300 million was invested here in a renewable energy facility. It produces electricity. It meets the statutory terms. And the only place you will find anything about allocation is in the treasury guidance, which is not law. It's not law. It's an agency's informal guidance. There's no explanation of how it relates to the statutory text. There's no explanation of what a qualified or unqualified facility is. These are all arguments that the Justice Department has made in its litigation presentation. Any more questions? Thank you. Okay, thank you. Thank you both. The case is taken under submission. That concludes this panel's arguments for this morning afternoon.